The next case for argument is a State of Jeremy Hunter v. Uintah County, Docket 19-4086. Mr. Konduk, when you're ready. If it please the Court, Dave Konduk appearing on behalf. Please speak into the microphone, Counsel. If it please the Court, Dave Konduk appearing on behalf of the appellant, State of Jeremy Hunter. Your Honors, if I could start with a quote that's been attributable to the astronaut Jim Lovell, amongst others. There's three types of people in this world. Those that make things happen, those that watch things happen, and those that wonder what happened. I think that's very applicable to the facts of this case. Unfortunately, no one amongst the defendants that have been named fall into the category of those that make things happen. Mr. Hunter was booked into the Uintah County Jail on He reported that. On Friday at 5 o'clock, he was seen by Nurse Smuant, who took his blood pressure. Also, when he was checked in, he was told that he needed his medication for his high blood pressure. I'm sorry, I can't hear you. I am so sorry. Just open it up. Put it straight up near your mouth. There you go. There we go. Okay. You have two judges with hearing aids. I can't hear either, so that makes three of us. Anyway. Three kinds of people, those who can't hear. There are four types of people, the fourth category being those that can't hear. Anyway, he's checked in. He tells Mr. Anderson he needs his blood pressure medication. And he didn't have any with him. He didn't have any with him. That would be if they went through regular channels. If they felt that it was an emergent situation, they could, of course, get through other means, such as the hospital. But regardless, so checks in Thursday. Friday at 5, around 5, Nurse Smuant checks his blood pressure. It's elevated. And she makes the note that for the first time, she notes that he needs blood pressure medication and that she'll pick it up tomorrow, that morning being Saturday. So he's been there, he got there Thursday. Blood pressure medication is going to be picked up Saturday. Then Friday night is when things really start to go wrong. Now, of the defendant's names, there's two groups. There's those that work from 6 a.m. to 6 p.m. and those that work from 6 p.m. to 6 a.m. Let's start with the 6 p.m. to 6 a.m. because on Friday night, that's when things really went south for Mr. Hunter. Around 11 o'clock, or 8.40, his blood pressure is taken. It's 188 over 133. At 11 p.m., it's 176 over 118. Then at 11.24, he's manning the jail that evening, that being Kaitlyn Gurr, Cody Harrison, Tony Jensen and Darren Kelly. They all observe. They go to the cell to check on him because the complaints are so bad. They witness him on his hands and knees, crawling, spitting up, clutching his chest, and they do nothing. They say, well, let's move him to where he can be washed or let's lift his legs or let's do something, but they don't do what needs to be done. This is obviously a situation where somebody's got high blood pressure of this nature, clutching his chest, obviously in pain. He needs emergent help. That emergent help was not obtained for him. Didn't his blood pressure go down? The blood pressure went down, but still you've got the problem that if someone is going through an emergent situation, a heart attack, something of that nature, there's going to be a possibility of two results. Well, three results. One, fine, mild heart attack. Two, gets over the heart attack and lives, but there's going to be damage to his heart. Or three, he dies. In this case, it wasn't, I mean, those were the facts that were being presented. He didn't have a heart attack. He had cardiac tamponade. Right. He had pericardial tamponade, whereas the sac was slowly filling up with blood. Right. But the symptoms were mere that of a heart attack. That is, high blood pressure, chest pains. It's certainly one of those things that would be on somebody's list of what's wrong with this person. I go, I see somebody, here today, somebody, I see somebody crawling on the floor, grabbing their chest, spitting up, and I know that they've got a blood pressure of 188 over 133. I'm going to think, this person needs help. I need to act. And indeed, that's what the law says, too, is that if they are aware of the risk, of None of them abated the risk. Whatever they did, be it make him more comfortable, try and get him to breathe slowly, try and get him to settle down, whatever that was, that's not abating this risk. And unfortunately, Judge Stewart found that no, he didn't find that there weren't facts that supported a claim for deliberate indifference. He just found that no reasonable jury could find in favor of the plaintiff. They did all they thought they could do, didn't they? They checked with the nurse and indicated that, okay, we just got to calm it down, and his blood pressure was coming back to normal from the high part. He had no meds when he came in. His neck veins weren't distended. Nobody took any heart sounds to see if there was muffled heart sounds, which would be a classic cardiac tamponade problem. What more could they have done when he said, oh, I'm going to be okay? Well, he didn't say he was okay when he's on the ground clutching his chest and spitting. Subsequently, he did, didn't he? Subsequently, but that's not the time. The time is when you see something going on like that, and you're watching in a medical emergency that you need to act. You need to do something reasonable to abate the situation. They did nothing. Then in their minds, the situation was abated later on because it seems like his blood pressure went down, and it seemed like he was doing better. But again, when that medical condition is going on, he's going to be suffering. There's a significant serious chance that it's either a heart attack or something related to heart, and something bad is going to happen, be it permanent damage to that heart or death. In this case, it was not the heart attack, but it was a pericardial tamponade, the cause to death. But still, there was an emergency situation. Do you think that the jail staff should have overridden the nurse's direction? Well, great question. One is, the simple short answer is yes, because if the information that's being given is something that they don't, that is unreasonable, then they don't need to rely on it. But I don't believe that they were ever given any information from the nurse. The only information, the only testimony was that of Corporal Robbins, Gail Robbins. He said that at 11 o'clock, he called Nurse Smuin. He also said that when he got on shift, he was told by Corporal Gowan that, hey, Jeremy Hunter has been seen by Nurse Smuin and PA, but Corporal Gowan testified that he didn't know anything about Jeremy Hunter or his condition until Saturday morning when he got to work at 7 a.m. shortly before Jeremy Hunter collapsed. So there's all kinds of inconsistencies with Corporal Gail Robbins' testimony, and whether he made that call at 11 o'clock is highly questionable. I don't think, there's no evidence that it occurred, it's just him saying that it occurred, but that is not, that's still not satisfying the requirement, it's not passing off the test of deliberate indifference. And that is, if something is so obvious that, the very fact that the risk was so obvious satisfies the subjective test of deliberate indifference, page 752 of the Mata case. This falls exactly under that. It's also like the Weatherford case. In the Weatherford case, the defendant came on duty at 1 p.m. and was told by medical staff, hey, this guy's okay, he's going to be okay until the morning. You don't need to worry. And the person complained of heart, chest pains, not high blood pressure, but just chest pains. Other inmates said, he's having problems with chest pains. The defendant didn't do anything, that person died, and this court said, yes, that conduct constitutes deliberate indifference. That's exactly what we have here. We have someone that is obviously, so if the phone call occurred, the steps that they took afterwards were not, it was unreasonable to follow any advice that may or may not have been given at 11 o'clock by Nurse Smuin in a phone call that nobody knows exists. And there's no evidence that they were even told by Gail Robbins what Nurse Smuin said. They just knew that Nurse Smuin, or according to Gail Robbins, that Nurse Smuin had been contacted. I don't know what that contact consisted of, because when he calls at 3 a.m. and calls Kate Smith, that one is documented. Kate Smith says, yeah, I just got a phone call, and all they did was tell me what Deputy Gallant's own, or Corporal Robbins, all Corporal Robbins did is he informed me that, yeah, he's got a blood pressure now, and he gave her the low reading of 130 over 180, or whatever it was, but it had calmed down, and I think he's having anxiety problems. Oh, okay, and so Kate Smith said, well, tell me if some changes, let me know. He didn't ask for medical advice, he didn't ask for medical opinion, he just informed her of what the situation, as he viewed it, was. Then, let's go back to Kate Smith, LPN. She then comes on duty at 6 a.m. First thing she does is check on Jeremy Hunter, 6 a.m., 6 a.m. on Saturday morning. They have moved him into the different place. Right, he's now up front now, so he can be observed, but again, damage has already been done, and nobody did anything. So now he's moved up front, and she comes in, as an LPN, at 6 a.m., he says to her, it feels like it did when I had a heart attack. So he's telling her now, this is a heart attack, and what does she do? Nothing, absolutely nothing, until 8.30, when she calls Nurse Smuin. To make it more understanding, or have a better understanding of what was in Kate Smith's mind, she said, oh yeah, if this was a member of my family, I would have called for an ambulance. But she didn't, in this case. I don't know what more you can have, or what more of a situation would call for a finding of deliberate indifference than a medical personnel showing up at 6 a.m. that has medical knowledge, that sees somebody's condition, and does nothing whatsoever. Saying that, yeah, well, if it was my family, I'd call an ambulance, but this is a prisoner. She also testified that she was new. Whether she was afraid to do anything, or whatnot, or if she was not appropriately instructed or whatnot, inferences can be drawn. But the fact of the matter is that she didn't do anything. Well, negligence is not the same as deliberate indifference. Negligence is not deliberate indifference. It's a scale. It's somewhere between intent to actual intent, and negligence is on that scale. So if a jury finds this negligence, right, there's no deliberate indifference. But I don't see how you can say that a reasonable she, in her mind, would call for an ambulance if it was anybody else, but for this person she's not going to call an ambulance, knowing that he's got a substantial risk, knowing what the conditions are. And she didn't do anything. I've got 40 seconds left, but I want to save it for rebuttal. Good morning, judges. My name is Frank Myler, and with me at the table is my associate, Andrew Hopkins, and we represent all the Uintah County defendants. Most of the material, almost all of the material raised in the appellant's brief was not raised below, and I think that's significant because it keys into some of the key issues even that were just talked about. For instance, it was never denied that a physician assistant actually saw him, but that's not what we were trying to prove. Again, the fact is it's not denied that, and I'm quoting from his brief on summary judgment, he puts on a fact that Corporal Robbins testified that at the time he commenced his shift on December 19th, he was only told that Jeremy Hunter was having problems, had been seen by Nurse Smuin and the PA, and was in G block and just needed to kind of keep an eye on him. His claim at that point is that he should have somehow done something more, because that's what he claims here on summary judgment that Corporal Robbins... Did Corporal Robbins consider the situation an emergency at some point? No. So he considered it to be a concern when it is brought to him at 11, that he was, first of all, the PA is the one that said the panic attacks. There's some confusion about that, but it's clearly the PA, and everyone else is parodying the fact that this person has anxiety and panic attacks. All right. So he's given that information that they're supposed to watch him. He's watching him, and there's a concern, absolutely. He's familiar with people having high blood pressure and anxiety just by the mere fact that they're in jail and they're detoxing, which was the belief in this instance that he was detoxing. I thought that Corporal Robbins testified to the question, at any time did you consider this was an emergency, and the answer was sure. After that first time, I called the nurse. Right. But that's what you do. That's what you do in the jail. If you think there's a concern, you call the nurse. The nurse that's on call, whoever you're supposed to call, he called Nurse Smuin, and this is so important, because some of the things that he's told then is... And first of all, there's other officers that knew he called it and testified that they knew he had called Nurse Smuin. True, they don't know exactly what that conversation was, but they had known he had called Nurse Smuin to check out this situation. But what Nurse Smuin says, it's not his heart that's the problem. He'll be okay. The PA has seen him, and I've seen him. You just need to keep an eye on him. He'll get his medications in the morning. That wasn't enough. He was questioning. He's in charge, and he's going to question, should I take him to the hospital? She said, no, it's not his heart that's the problem. I don't know what else he could do at that point, especially... One thing he could do, and I'm curious whether you think he needed to do, is Mr. Hunter had been in this jail many a time, and there was a record that he had heart issues. Did somebody have an obligation when he's complaining about his heart to look and see beyond? Just saying, maybe he's having an anxiety attack at three in the morning? Well, first of all, there wasn't an issue that he had heart issues. It was specifically high blood pressure issues. I'm talking about his previous visits. Right. On his previous ones, it was actually the high blood pressure issues, but he had never had a problem when he was in there before. There had never been any incidents or whatsoever. What he was displaying in front of them, what was exactly what was diagnosed by the physician assistant, that he was having anxiety and panic attacks. And then when you see this situation where he's... Corporal Robbins has dealt with this before. He's given him breathing exercises that have helped other inmates in the past. And while he's doing that, he's improving. So at 11, his blood pressure was not terrible, but it actually went down to quite a reasonable amount. After they talked to him, they gave him the breathing exercises. They asked him, look, can I take you to booking so we can keep a better eye? And he says, no, I'll be fine. That is so much different than the Weatherford case cited by the plaintiffs, where he was complaining, other inmates were complaining. He had another cellmate there. There's no evidence that the cellmate ever complained saying, no, this guy needs help. None of that. And again, in the Weatherford case, the interesting thing is there was a nurse that weighed in on it early on, but was never followed up with a nurse. So Robbins is doing what he should do. And is it the perfect thing to do after the fact? Apparently not. But we believe so at the time. It was reasonable what he did. He took action. He didn't... He wasn't like that jailer in Weatherford that heard all those complaints and literally did nothing but look at him. Instead, he helped him. He helped him and he saw that blood pressure go down. The next incident was 2.30. He again had him... He says, okay, we're moving you to booking. I'm going to watch you the rest of the night. His testimony is that he put him right in front of his computer and he stared at him literally the rest of the night because he worked there at booking so he could keep an eye on him. But what he found then is normal blood pressure. He called the nurse that was going to be coming on duty. Nurse Smith, who was an LPN. He reported back that blood pressure to her and she said what to do. If there's anything else that happens that you're concerned about, call me, call Nurse Smuin or the PA right away if anything else happens. What happens then? Everything is improving after 2.30. He at 2.30, he says can I let you take a shower? That's not normal. Can I get you new clothing? Can I get you new bedding? He gets him all those things and he thanks him for it and he goes to sleep. When he wakes up in the next season at 5.30 before his shift ends, he says I have not felt this good in a long time. That's not like the Weatherford case. This is a case where he's feeling good that he's doing something that's helping this inmate. And then what he's done is there's no terrible issues after that, after 2.30. But Smith had had that conversation with him. In her due diligence, she immediately comes to see him first thing, checks him out. No, she can't get his medication until 9 because that's when the pharmacy opens. But she checks him out, normal blood pressure, normal everything. He's moving around normally. There's no whining sign. He's not clutching his chest. She's taking the information. Then what she does is, to be reasonable, she calls Nurse Smuin again and says what else should I do? Now there's some question that the council is confusing some things is why Nurse Smuin didn't say that Corporal Robbins had called her. The reason is he's calling an incident report something that's a medical record. Nurse Smuin had a medical record that she entered when she was on shift. She wasn't on shift after this, during this time. Of course she didn't put it in her medical record because she didn't do another medical record. So of course the phone call from Robbins was not in there, but his phone call to Nurse Smith was because Nurse Smith saw him the next day. And so there is documentation of that. And, Council, Corporal Robbins did, I'm over here, Corporal Robbins did testify to the phone conversation with Nurse Smuin. Is that correct? Absolutely. Absolutely. There was never any, and even on the lower court, there was really never any discussion that that didn't happen until this appeal. It's in the record that that conversation happened, but he should have just not called her. He should have just simply called an ambulance. That's what was argued below. Let me ask you a different question. Why didn't the state's declaration from its expert create a triable issue? Sure. Because first of all, he had no personal knowledge. He had never worked in a rural jail whatsoever. He worked at the University Medical Center, which is quite a bit different than in rural Utah. Rural Utah in Vernal had never had this incident ever happen before. You can't infer any circumstantial evidence in Farmer v. Brennan unless you've had this situation happen before and you learned from that situation. This is the first time that this had ever happened. Actually, some of the officers had seen him in the jail before. No problems. Zero problems with this person. And so this is the backdrop that we have here. Bernheisel has no information about this. Then he misquotes the record. He misquotes the record and talks about this allergy to ibuprofen. Well, it's in that same record that was changed to say, no allergy to ibuprofen. In the same very record. So he doesn't have any personal knowledge to any of the information he has. He actually misquotes and misunderstands what information people did have at the time. You didn't present your own expert, did you? No, we did not. Part of the problem is that expert doesn't get in someone's head. An expert does not help on the issue of the subjective component of deliberate indifference. It's what information each individual had, what they did with it. And there's some situations like Weatherford where people had information and did nothing. And that's the important thing here is everyone did quite a bit. They can't be said to say they just sat back and ignored his complaints. Could they have done better with 20-20 hindsight? Absolutely. They said, she's now a registered nurse. If this were your relative, would you call? She said yes. But that's not what she did then and that's not what she thought of doing. Instead she thought of calling Nurse Smuin and Nurse Smuin did not tell her to call an ambulance. That's in her affidavit. She was not told by Nurse Smuin. She was told to keep watching him and get the medication. And even Nurse Smith, she leaves early for that pharmacy. She wanted to make sure she got that medication right away because that is what they said he needed. Did Nurse Smith or LPN Smith tell Nurse Smuin that Hunter, upon her arrival and greeting him right on the appointed hour, that Hunter told her he was having chest pains and felt like he did when he had a heart attack? That seems like an awfully big fact. I don't think it actually said in the record that he was having chest pains then. But he made that comment and I do not know whether or not that precise statement was given. However, Nurse Smuin and PA Clark had already seen him that day before. And so she's given him the information of a rundown. She may have said that, she may have not, but we do not have that precision from the record actually. Why is that not deliberate indifference on Nurse Smith's part? Well, first of all, she's seeing normal blood pressure readings. She's not seeing any abnormalities. He's walking and moving appropriately and fine. And she's been told that what he needs is his medication and she's there to get it as soon as she can. But she questioned, okay, I'm an LPN, I've only been working here a couple months, which was the truth. I need to call the nurse. And so deliberate indifference, the subjective component, takes into account who you are, what your experience is. If this is somebody that had been working for years and it probably was a registered nurse, I think maybe that would be a different question. But it's not. It's an LPN who just started working there two months before and she does the right thing. She calls her boss, who's over her, her supervisor, which was Nurse Smuin, and gives her the situation and she did not tell her to call the ambulance. Well, you say the situation, but you can't say that she told Nurse Smuin that he said he felt like he did when he had a heart attack. That's true. I cannot say that. That's a big fact. Well, I think that the question is, is that when you're presenting yourself, the patient's presenting themselves as someone that seems normal and is not, I don't think it was, there was any evidence that he was feeling that that minute, you know, that he was somehow feeling that way. It was documented by the physician's assistant that he has anxiety and panic attacks and that, in the chest pain, and then they had chest pain from that. And so I think she's legitimately going on what that information was and acting on it. And so she's observing him, she's noticing him, she's watching him, she's keeping him here, there in the booking area so he can be closely watched. In fact, high blood pressure had nothing whatever to do with his situation. Well, that's another good question. And even hitting his head could have had a huge impact on the... Well, he had cardiac tamponade, and so, I mean, nobody tripped to that, and they didn't until the autopsy, which is when they usually find cardiac tamponade. That's true. And so here was somebody that was actually, from 2.30 on, was appearing very normal. He said he had never felt so good, or I should say, he hadn't felt this good in a long time. I mean, this is not, like I said, it's not like the Weatherford case, it's not like some of these other cases where there's all these complaints, hey, help me, help me, help me. No, he's actually fully satisfied with the help that they're giving him. And this is the hard problem. Again, the evidence was that this had not happened before at this jail. There had not been, you know, this wasn't a jail where there's a high volume of people, you know, having these kinds of difficulties whatsoever, but he had been in before, and those officers that had seen him before never, ever encountered any problem with him medically. And so... Counsel, just a technical question before time runs out. Sure. Appellant spends a number of pages in the brief on hearsay issues. Did Plaintiff Hunter present his hearsay objections in district court? Absolutely not. It wasn't in any of his brief, and it was not in the argument in the transcript. Interestingly, they didn't request the transcript. That's not my fault, but the fact is, is that there is zero evidentiary issues relating to hearsay whatsoever in the trial court in any of the briefing or in the oral argument. And in fact, it's not hearsay. Like I just read from that comment, he's almost... The plaintiff's basically agreeing that the PA and Smuin, excuse me, that Robbins is told that the PA and Smuin had seen him. There's lots of documentation that Smuin had seen him. In fact, she had her own record saying that she had seen him and checked his blood pressure and had passed that along. So we feel that those issues were not raised, but it's not hearsay anyway. Smuin could have said anything. She could have said he's already been checked out of the hospital. They're not going to know that. They're not going to talk to the PA. It's the nurses that talk to the PA, not the actual individuals. And so what we have here is essentially somebody trying to respond appropriately to what's already been given to them by the PA and the nurse. Thank you. Thank you. I've got to be quick. First of all, Dr. Bernheisel does have, on 000158, you look at his qualifications. He's clearly qualified to testify as to jail, jail procedures and whatnot. He dealt with the Salt Lake County Jail, with the Utah State Prison, and it goes on, on 00158. Secondly, yes, I admitted that Robbins testified to those things. I never said that those things were true or anything of that nature. Thirdly, we're looking at each defendant individually. So if Gail Robbins somehow had this conversation, which the evidence doesn't seem to portray, if he had that conversation, that doesn't absolve these other individuals, because you look at what they did. They saw this dramatic event and did nothing. Well, they notified Corporal Robbins, didn't they? Well, they notified Corporal Robbins. I mean, didn't they go along the chain of authority? The chain of authority is to be followed, but their own policies and procedures says if it's an emergency, you call an ambulance. Yes, call an ambulance and tell the higher up. There's two different things you do. One of which is to call the ambulance, but that's common knowledge. That doesn't even need to be in the policies and procedures book. And we're talking about the events that occurred as they were observing at 11 p.m., at 1124, when he's crawling on his hands and knees, and to then say, well, later on, everything's great. And then finally, Kate Smith's mind is, so you can see what's in her mind, because she would have called an ambulance if it would have been her own family member, but she didn't. So the idea that, oh, everything's fine and dandy and he was doing just great, that argument doesn't work. I'm over. Are there any questions? I think that does it then. Thank you, counsel, for your arguments. The case is submitted and counsel are excused.